IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD L. ALLEY, | No. CIV S-05-1921-LKK-CMK-P |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| TOM L. CAREY, et al., | |
| Respondents. | |
| _____/ | |

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the September 18, 2002, denial of parole. Pending before the court are petitioner's pro se petition for a writ of habeas corpus (Doc. 1), respondents' answer (Doc. 25), and petitioner's reply (Doc. 26). Also before the court is a supplemental brief (Doc. 36) addressing the applicability of Hayward v. Marshall, 512 F.3d 536 (9th Cir. Jan. 3, 2008), and respondents' request for a stay (Doc. 32) pending issuance of the mandate in Hayward.[1]

---

[1] In Hayward, a three-judge panel of the Ninth Circuit concluded that the denial of parole violated the petitioner's right to due process because there was no evidence in the record of the prisoner's current danger to the community if released. The case is being reheard en banc.

1

## I. BACKGROUND

**A.** **Facts**

The Board of Prison Terms (now the Board of Parole Hearings, the "Board") recited the following underlying facts concerning petitioner's commitment offense, and petitioner does not allege that these facts are incorrect:

> On May the 12th, 1981, at approximately 1:45, police officers were dispatched to – (location omitted in original). Upon arrival they observed the defendant Alley standing on the sidewalk next to a motorcycle holding a gun in his hand. They ordered the prisoner to place his gun down and he complied. The prisoner then spontaneously said, "I came home and saw her with a gun. She pointed it at me and was going to shoot me. I had to protect myself and shoot her." The officer entered the residence, observed Belynda Hicks . . . lying on her back across the couch with what appeared to be a gunshot wound to her chest and knees. The ambulance was summoned and she was pronounced dead at 1:40 a.m. A .38 caliber Smith and Wesson was found underneath the body of the victim. The victim was the girlfriend of the prisoner. The prisoner was placed under arrest and taken into custody without incident. The San Francisco Medical Examiner Coroner determined the cause of the death to be multiple gunshot wounds.

During the course of the 2002 parole hearing, the presiding commissioner asked petitioner what had occurred to cause Hicks to come after petitioner with a gun and petitioner offered the following:

> For many years I have often thought about that, and a lot of it I have to contribute to my behavior. . . . [¶] And what I mean by my behavior is the type of lifestyle I was living. I was living where I felt I had to have more than one woman. . . . [¶] I was engaged in a relationship with Gail Hampton. We had broke up and I started shacking up with Belynda Hicks. And I was still in between two relationships, seeing both women. However, my supposed to be my best partner, who I thought was my partner, brought these two women together. And that's how they come to be in Mrs. Hicks' home the morning when I got off of work. . . . [¶] And she was angry because I was messing with her and messing with Gail. I guess they must have talked about it. And the next thing I know a gun gets pulled and I reacted.

/ / /

/ / /

/ / /

1  Petitioner stated that, after Hicks pulled the gun, he went outside to talk to Hampton, but she was
2  gone.  Petitioner added:

> I came back up in the house not with the intent to kill her.  I came back up in the house with the intent to pack myself to leave since all my property was in the house.  When I got back up into the house she pulled the gun on me again.  So what was I supposed to do?  I tried to get the gun from her.  I even rushed her and tried to get the gun.  My hand slipped out of her hand.  And when I backed up I seen the gun coming around at me again.  I said drop the gun, drop the gun, drop the gun.  The gun was still coming.  And what was the only time when I pulled my gun, only when I seen that my life was in danger.  I wasn't intending to kill her.

According to petitioner, he had a gun on his person at the time because he was a security guard and had just returned from work.

### B.  Procedural History

Petitioner was convicted of first degree murder following a jury trial.  In March 1982 petitioner was sentenced to a total of 27 years to life in state prison.[2]  On September 18, 2002, petitioner appeared before the Board for a subsequent parole determination hearing.  The record does not reflect how many prior parole suitability hearings petitioner had.  According to petitioner, his minimum eligible parole release date was initially determined to be April 10, 1995, but was subsequently re-calculated to be May 8, 1997.[3]

After the Board denied parole, petitioner filed a number of administrative appeals and then a habeas corpus petition in the San Francisco County Superior Court.  The Superior Court indicated that petitioner raised the following four claims:

   1.   [Petitioner] did not receive an indeterminate sentence and the [California Department of Corrections] incorrectly classifies him as a life prisoner;

/ / /

---

[2]  This sentence is comprised of an indeterminate sentence of 25 years to life for first degree murder plus a 2-year enhancement for use of a firearm.

[3]  The Board's 2002 decision indicates that petitioner's minimum eligible parole date was June 7, 1997.

3

    2.    The [California Department of Corrections] failed to properly apply credits under [California] Penal Code Section 2930 et. seq. and reduce Petitioner's minimum term of imprisonment in violation of his due process and equal protection rights;

    3.    The Board of Prison Terms has no legal authority or jurisdiction to deny Petitioner's parole and therefore is holding him beyond his minimum term in violation of his due process rights; and

    4.    Petitioner . . . objects to a 1979 internal memorandum from the Office of the Attorney General.  In relevant part, this memo discusses that life prisoners sentenced under [California] Penal Code § 190 after its amendment by Proposition 7 in 1978 are not entitled to . . . work credits. Petitioner alleges that this interpretation of § 190 is contrary to its express language and violates his due process rights."

The Superior Court denied relief in a reasoned decision issued on June 11, 2004.  Both the California Court of Appeal and California Supreme Court denied subsequent habeas petitions without comment or citation.

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

4

petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner). When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

Under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th

5

1   Cir. 2002). If so, the next question is whether such error was structural, in which case federal
2   habeas relief is warranted. See id. If the error was not structural, the final question is whether
3   the error had a substantial and injurious effect on the verdict, or was harmless. See id.

4         State court decisions are reviewed under the far more deferential "unreasonable
5   application of" standard where it identifies the correct legal rule from Supreme Court cases, but
6   unreasonably applies the rule to the facts of a particular case. See id.; see also Wiggins v. Smith,
7   123 S.Ct. 252 (2003). While declining to rule on the issue, the Supreme Court in Williams,
8   suggested that federal habeas relief may be available under this standard where the state court
9   either unreasonably extends a legal principle to a new context where it should not apply, or
10  unreasonably refuses to extend that principle to a new context where it should apply. See
11  Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court
12  decision is not an "unreasonable application of" controlling law simply because it is an erroneous
13  or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 123 S.Ct.
14  1166, 1175 (2003). An "unreasonable application of" controlling law cannot necessarily be
15  found even where the federal habeas court concludes that the state court decision is clearly
16  erroneous. See Lockyer, 123 S.Ct. at 1175. This is because ". . . the gloss of clear error fails to
17  give proper deference to state courts by conflating error (even clear error) with
18  unreasonableness." Id. As with state court decisions which are "contrary to" established federal
19  law, where a state court decision is an "unreasonable application of" controlling law, federal
20  habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn,
21  283 F.3d at 1052 n.6.

22        The "unreasonable application of" standard also applies where the state court
23  denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d
24  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions
25  are considered adjudications on the merits and are, therefore, entitled to deference under the
26  AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

### III.  DISCUSSION

In the instant federal petition, petitioner raises the following three claims:

1. The California Department of Corrections has failed to apply petitioner's [California] Penal Code § 2930, et seq., credits to reduce his minimum term of imprisonment, thereby denying him a state-created liberty interest in violation of his due process and equal protection rights guaranteed by the California and United States constitutions;

2. The state Attorney General's Office, in coordination with the California Department of Corrections and the Board of Prison Terms, has promulgated an interpretation of the penal statutes that is contrary to the express language of the provisions, resulting in a denial of petitioner's due process rights; and

3. The Board of Prison Terms had no legal authority or jurisdiction to deny petitioner's parole as calculated and mandated by the controlling statutes of his case and has, therefore, acted to illegally hold him in excess of the minimum term prescribed by law in violation of his due process rights.

All of petitioner's claims appear to relate to changes in state law when California switched from the indeterminate sentencing law ("ISL") to the determinate sentencing law ("DSL").  His claims focus on the calculation of his minimum eligible release date in light of statutory good-time conduct and work credits.

Respondents argue in their answer that these claims are not cognizable on federal habeas review under 28 U.S.C. § 2254.  They also argue that petitioner's claim that his conduct credits have been miscalculated is untimely.  Respondents contend that, to the extent petitioner claims the Board violated due process in denying parole in 2002, the claim is unexhausted and untimely.  They also address this last issue on the merits.

/ / /

/ / /

A. **Good-Time Conduct Credits**

Petitioner argues:

> Prior to July 1, 1977, the Indeterminate Sentencing Law . . . governed the imposition of sentences for all crimes. Under this law, all sentences were statutorily defined minimum and maximum terms, with the actual terms set by an administrative agency. There were no good time provisions in the ISL. Each sentence could vary anywhere within the statutory minimum and maximum bounds. In fact, all prisoners received in state prison after January 1, 1948, were specifically precluded from the benefit of the good time credits provided in former Penal Code § 2920-2926. Good time credits were irrelevant given the Adult Authority's (Parole Board) authority and broad discretion to determine the actual length of confinement.
> However, with the change from the Indeterminate Sentencing Law (ISL) to the Determinate Sentencing Law (DSL) on July 1, 1977, the Legislature enacted Penal Code § 2930-2932 which provide prisoners with the opportunity to receive a one-third reduction in their sentence for good behavior and participation in prison programs. Penal Code § 2930 specifies that the credit provisions apply to those prisoners sentenced under . . . the DSL. The California Department of Corrections and the Board of Prison Terms maintain that petitioner is not entitled to the benefit of these credit provisions because he was sentenced under Penal Code § 1168(b). The express language of the relevant statutes and the legislative and/or voter's intent behind them prove that petitioner is being denied a statutory right.

Petitioner's argument that he was improperly denied good-time credits is factually flawed. As the state court noted:

> Under [California law], a prisoner could waive the right to [good-time] conduct credits and thereafter receive the more liberal . . . work credits. (citation omitted). Petitioner executed the . . . waiver and started earning . . . work credits.

Because petitioner waived his right to good-time conduct credits, he was not entitled to such credits in calculating his minimum release date for purposes of parole. Therefore, this claim lacks any merit and should be denied.[4]

/ / /

---

[4] For purposes of these findings and recommendations, the court will assume, without deciding, that petitioner's claim relating to good-time conduct credits is timely and cognizable.

8

**B.    Work Credits**

As petitioner states, the denial of credits (either good-time conduct or work credits) in his case is based on the classification of his crime as a "life sentence" under the former ISL. The gravamen of his argument is that, because he was sentenced after the DSL went into effect, he should not have been classified as a "life prisoner" under the ISL and that, under the DSL, he is statutorily entitled to various credits in calculating his sentence. Petitioner appears to assert that his rights to due process and/or equal protection were violated by denial of credits.

With respect to petitioner's classification as a "life prisoner" under the ISL, the state court held:

> Although the determinate sentencing law replaced indeterminate sentencing in 1977, certain crimes remained punishable by indeterminate sentences. (citation omitted). These were the life sentence crimes such as first-degree murder. (citation omitted). Penal Code Section 190(a), for example, was passed by voter initiative in 1978 and was in effect when Petitioner was sentenced in 1982. Among other things, the section provided that a person guilty of murder in the first-degree could be sentenced to life without parole or 25 years to life. (citation omitted). Courts have held that these are by their nature indeterminate terms. (citations omitted).
>
> Because Petitioner was sentenced to 25 years to life for first-degree murder, Petitioner was sentenced to an indeterminate term. (citation omitted). [¶] The board of Prison Terms ("Board") administratively classifies a prisoner who is serving a life sentence with the possibility of parole as a "life prisoner." (citation omitted). [¶] Because Petitioner is serving a life sentence with the possibility of parole, he is correctly classified as a life prisoner.

Thus, under state law, petitioner was sentenced to an indeterminate sentence and is properly classified as a "life prisoner." Regarding credits[5], the state court held:

> After Petitioner had started serving his sentence in 1982, Sections 2933, 2934, and 2935 were added to Article 2.5. (citation omitted). [¶] The new Section 2933 provided that prisoners sentenced to a determinate term . . . could reduce their sentence by up to one half for participation in work, training, or education programs. (citation omitted).

---

[5] Because petitioner waived the right to good-time conduct credits, the court need only focus on the state court's analysis of work credits.

> Because Petitioner's 2-year penalty enhancement for using a firearm is a . . . determinate term (citation omitted), the CDC applied the newly enacted Sections 2933 and 2934 to this fixed portion of Petitioner's sentence (citation omitted).
>
> * * *
>
> In 1987, the Attorney General concluded that state prisoners serving indeterminate sentenced of . . . 25 years to life . . . are ineligible for section 2933 work credits. (citation omitted). The Attorney General required the CDC to reverse its earlier directive that allowed life prisoners to earn Section 2933 work credits. (citation omitted).
>
> The First District Court of Appeal held that the Attorney General was correct: prisoners serving indeterminate sentences were ineligible for Section 2933 work credits. (See In re Monigold (1988) 205 Cal.App.3d 1223, 1228 ]"Monigold II"]). However, ineligible prisoners who had participated in the Section 2933 program should be credited for all work done prior to the Monigold II decision. (citation omitted).
>
> The CDC found the Monigold II rule to apply to Petitioner and in 1990 granted him the work credits he had earned prior to the court's decision. (citation omitted). This advanced Petitioner's minimum eligible parole date to May 8, 1997. [¶] Contrary to his allegation, Petitioner thus received the credits he was entitled to under law and application of these credits in fact reduced his minimum term as provided for in Section 190, the statute under which he was sentenced.

In addition to addressing petitioner's right under state law to work credits, the state court discussed petitioner's due process and equal protection arguments. Addressing whether petitioner's due process rights had been violated with respect to calculation of his release date, the state court continued as follows:

> Petitioner's allegation that he was denied due process of law is without merit. There is no due process violation if there is no liberty interest to protect. (See Olim v. Wakinekona (1983) 461 U.S. 238, 25). A prisoner who is ineligible for the Section 2933 program under state law has no due process right to earn work credits under that section. (See Brodheim v. Rowland (1993) 993 F.2d 716, 717). And as explained above, Petitioner is ineligible for the Section 2933 program. (citation omitted).

///

///

///

Regarding equal protection, the state court held:

> Petitioner's allegation that he was denied equal protection under law likewise is without merit. "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner. (In re Eric J. (1979) 25 Cal.3d 522, 530). (emphasis in original). [¶] Petitioner has not shown that the state has adopted an impermissible classification that treats petitioner differently from similarly situated first-degree murder prisoners. (citation omitted).

To the extent petitioner challenges the state court's conclusion that, under state law, he is properly classified as a "life prisoner," the claim is not cognizable on federal habeas review. A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941). In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

///

///

///

As the state court observed, under clearly established Supreme Court precedent there can be no due process violation where there is no liberty interest at stake. While the federal constitution itself protects a liberty interest in good-time credits, see Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974), the court is aware of no case which stands for the proposition that the constitution protects work credits. Further, because petitioner has no entitlement under state law to work credits, state law cannot be the source of a protected liberty interest in such credits.

Finally, petitioner's equal protection argument must fail because, as the state court noted, there is no evidence that petitioner is being treated differently that other prisoners with similar indeterminate sentences.

For all these reasons, the court concludes that the state court's determination was neither contrary to nor an unreasonable application of clearly established law.

### C. Denial of Parole

Petitioner raises two arguments regarding the Board's "legal authority" to deny parole. In his petition, petitioner contends:

1. With the change from the Indeterminate Sentencing Law to the Determinate Sentencing Law . . ., the power of the Board of Prison Terms to "fix" or "re-determine" terms of imprisonment was repealed and not replaced; and

2. The Board of Prison Terms' repeated misinterpretation and misapplication of the penal statutes has resulted in the denial of petitioner's state-created liberty interest in parole release at the expiration of his minimum term.

These specific arguments are nothing more than a re-packaging of petitioner's other arguments. Specifically, petitioner argues in his other claims that the Board's denial of parole violated due process because his release date was not properly calculated given the Board's alleged "misinterpretation and misapplication of the penal statutes. . . ." For the reasons discussed above, these arguments lack merit. By classifying petitioner as a "life prisoner," the Board was not improperly fixing or re-determining his sentence. Moreover, the change from the ISL to the DSL is irrelevant in petitioner's case because, even after the DSL was enacted, petitioner

received an <u>indeterminate</u> sentence.

In their answer, respondents address whether the Board's denial of parole violated due process. In particular, respondents raise the following arguments: (1) such a claim is not cognizable because California inmates do not have a liberty interest in parole; (2) assuming there is a liberty interest in parole, the "some evidence" standard does not apply on federal habeas review because it is not clearly established by the United States Supreme Court; (3) assuming the "some evidence" standard does not apply, due process only requires that prisoners be given an opportunity to be heard and notice of any adverse decision; and (4) assuming the "some evidence" standard applies, it was met in this case. These issues are distinct from the issues raised in the claims discussed above. Petitioner never argues in his petition that the denial of parole was arbitrary because it was not supported by some evidence.[6]

Petitioner confirms this in his response to the court's order for further briefing in light of <u>Hayward</u>. He states:

> . . .[P]etitioner is not challenging the Board of Prison Terms' finding of "unsuitability," and did not specifically argue for the applicability of the "some evidence" standard of judicial review or the existence of a protected liberty interest in parole under California Penal Code § 3401.
>
> \* \* \*
>
> Therefore, petitioner contends that <u>Hayward</u> has no direct impact on the resolution of the claims in the instant petition. . . .

Because petitioner is not raising any claim relating to the issues raised by respondents, as outlined above, it is not necessary to stay this case pending resolution of <u>Hayward</u>.

///

///

///

---

[6] Assuming, of course, that the "some evidence" test applies.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Petitioner's petition for a writ of habeas corpus (Doc. 1) be denied;

2. Respondents' request for a stay (Doc. 32) pending issuance of the mandate in Hayward be denied as unnecessary; and

3. The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 6, 2008

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE